Filed 11/30/15  P. v. Howard CA1/1
Reposted to provide correct version
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL HOWARD,<br><br>    Defendant and Appellant. | A139179<br><br>(Alameda County<br>Super. Ct. No. H53333B) |

A jury convicted defendant Daniel Howard of one count of first degree murder and one count of conspiracy to commit murder based on his participation in the 2010 killing of 17-year-old Justice Afoa, although it found untrue an allegation that Howard personally used a knife during the murder.[1]  It also convicted Howard of two counts of attempted premeditated murder, one count of criminal threats, and one count of simple kidnapping based on his attempt in 2012 to hang his pregnant girlfriend, A.R., from a tree.[2]

After the trial court determined that a prior conviction for assault with a firearm constituted a strike, it sentenced Howard to prison for an indeterminate term of 70 years

---

[1] The knife-use allegation was made under Penal Code section 12022, subdivision (b)(1). All further statutory references are to the Penal Code unless otherwise noted.

[2] Howard was convicted under sections 187, subdivision (a) (first degree murder), 182, subdivision (a)(1) (conspiracy to commit murder), 187, subdivision (a) and 664, subdivision (a) (attempted premeditated murder), 422 (criminal threats), and 207, subdivision (a) (kidnapping).  In addition, the jury found true the enhancement allegations that he committed the crimes of murder and conspiracy to commit murder for the benefit of a criminal street gang under section 186.22, subdivision (b)(1).

1

to life and a determinate term of 11 years, four months. The indeterminate sentence was composed of a term of 55 years to life for Afoa's murder, a concurrent term of 55 years to life for the conspiracy to commit murder, a consecutive term of 15 years to life for the attempted murder of A.R., and a concurrent term of 15 years to life for the attempted murder of her fetus. The determinate sentence was composed of a term of 16 months for the criminal threats and 10 years for the kidnapping.[3]

On appeal, Howard claims that his convictions for first degree murder and conspiracy to commit murder must be reversed because the trial court (1) improperly admitted into evidence testimony from A.R. that Howard was involved in Afoa's murder and hearsay statements by coconspirators, (2) incorrectly instructed the jury, and (3) committed cumulative error. We reject the two evidentiary claims but conclude that both convictions must be reversed because of instructional errors. Accordingly, we do not reach the claim of cumulative error, in which Howard seeks the same relief. On remand, the People will have the option of retrying both charges. (See *People v. Hernandez* (2003) 30 Cal.4th 1, 6-7.) If they elect not to retry the first degree murder charge, the judgment will be modified to reflect a conviction of second degree murder.

Regarding the 2012 counts, Howard claims that the trial court improperly failed to sever them from the 2010 counts and that insufficient evidence supported the kidnapping conviction. We disagree and affirm those convictions.

Finally, Howard contends that the trial court erred under section 654 by not staying the sentences for three convictions and that the determination he suffered a prior

---

[3] We note some errors on the current abstract of judgment so they will be avoided on remand. First, the abstract incorrectly indicates that Howard entered a plea to the counts of criminal threats and kidnapping and that the term for criminal threats is 8 months instead of 16 months. Second, the abstract incorrectly indicates that the indeterminate term for the murder count is to run concurrently to the determinate sentence instead of consecutively, as the trial court ordered. Finally, the abstract incorrectly indicates that the term without enhancement time for the attempted-murder counts is 15 years to life and that the second attempted-murder count is count 4 instead of count 5.

strike must be reversed.[4]  His section 654 claim lacks merit, but he is correct that the strike determination cannot stand, which means the allegation must be retried.

I.
FACTS

A.    *The Murder of Justice Afoa.*

1.    The murder.

In 2010, members of the Newark Memorial High School football team were engaged in an ongoing conflict with students affiliated with Norteño street gangs.  That September, 17-year-old Justice Afoa, one of the football players, and several of his friends went to the home of another Newark Memorial student, Daniela G., at her invitation.  When they arrived, Daniela was not yet there, but her older brother, Rafael Tovar, was outside and seemingly drunk.

Tovar, who was in his late twenties or early thirties at the time, is a self-admitted member of FMT (Fremont Mexican Territory or Fremont), a Norteño gang.  Tovar confronted a member of Afoa's group, a football player whose previous relationship with Daniela had ended badly.  Afoa pushed Tovar's shoulder and told him to "calm down" several times in an attempt to break up the fight, and Tovar responded by punching Afoa in the face.  Afoa punched him back, causing Tovar to fall.  Several others in Afoa's group hit Tovar while he lay on the ground, and they then left with Afoa.  Daniel R., a close friend of Daniela's who was also a student at Newark Memorial, testified that she and Daniela arrived at Daniela's house sometime later to find Tovar lying in the driveway, bleeding and struggling to speak.  He was taken to the hospital.

Howard, then 29 years old, had been good friends with Tovar and his family for several years and also belonged to FMT.  Tovar's and Daniela's sister testified that

_____

[4] Howard also contends, and the Attorney General concedes, that the proper sentence for attempted premeditated murder was 14 years to life instead of 15 years to life.  Although we need not reach this issue because our reversal of the strike determination will result in resentencing on the attempted-murder counts, on remand the trial court should resentence him on those counts in compliance with section 664, subdivision (a) and, if the prior-conviction allegation is found true again, section 667, subdivision (e)(1).

3

Howard told the sister sometime soon after the assault, " '[D]on't worry about it, we already got boys on it.' " After leaving the hospital, Tovar was recorded agreeing with a cousin in prison, also a Norteño, that Tovar and "Danny" were "going to take care of" the situation. During the same telephone conversation, Daniela indicated to the cousin that she was angry about her "brother get[ting] jumped" and wanted to retaliate.

About a week after the assault, Daniel R. again went to Daniela's house. Daniel R. saw two men leaving the house as she entered. One of them, whom Daniel R. identified as Howard, was a man Daniela called "Danny" or "Danny Boy" and referred to as "her brother." Daniel R. was surprised to see Tovar, who was playing a game and "had no bruises, no nothing," because Daniela had told her he was in a coma. When Daniel R. asked Daniela what was going on, Daniela said that Tovar "was working on something and he didn't want Daniela to open her mouth too quickly and start[] telling people he was out of the hospital[, s]o they created a story of hi[s] being in [a] coma" because he "didn't want to get his hands dirty" and wanted to avoid suspicion "when anything did happen." Daniela also told Daniel R. that Howard "would be the one handling it and Daniela would be the eyes." A few days later, Daniel R. saw Howard in the car with Daniela when Daniela arrived at Daniel R.'s apartment complex to retrieve a book.

In early October 2010, on the same day as a Newark Memorial football game, Howard sent a text message to Daniela that said, " 'Give me updates on your movements and when you guys are leaving so I can coordinate. What time about is the game[] over?' "[5] After Daniela estimated when the game would end, Howard responded, " '[W]here are you going, Fremont or UC,' " an apparent reference to Union City, and " '[A]lso what's he wearing? Let me know ASAP.' " Daniela texted back, " '[Z]igzag jacket with red green and black. Some white in front. It's striped. Gray cargo shorts and black high socks and a red hat. Hair pulled back in a ponytail. Jordans.' " She then sent

---

[5] For the sake of simplicity, our discussion of the evidence assumes that the person to whom a cell phone was registered was the person using it, though we recognize that cell phone records do not definitively establish who used a phone at any given time.

another message appearing to indicate that her group was at an In-N-Out Burger restaurant in Fremont. Howard later responded, " '[O]nly one red hat I seen . . . white boy with a black sweatshirt on. You in Fremont? . . . [¶] . . . [Y]ou still there[?]' " Daniela responded, " '[Y]eah. Where you at?' "

A few weeks later, on the same day as another Newark Memorial football game, Howard and Daniela again exchanged text messages. Howard texted, " 'Make sure you're giving me updates, okay,' " and Daniela agreed. She then sent a text saying, " 'Justice big dark ass is wearing a black sweater with his hair pulled back in a ponytail with light jeans.' " Howard asked, " 'What color jeans? What else? Socks, shoes . . .[,] hair band.' " Daniela responded with further details about Afoa's appearance and clothing. Shortly thereafter, Howard texted, " 'Let me know where you're going ASAP. . . . [¶] I just want to know everything and the location ASAP.' " Daniela initially indicated she was going to In-N-Out Burger but then texted, " 'Don't come. We lost the game and the guys are not gonna come.' "

Afoa attended a house party with several other high school students the night before Halloween. A friend of Afoa's saw some "Mexican guys" attack Afoa by trying to stab him with broken beer bottles. After fighting back, Afoa eventually ran away and escaped. The two men then entered the car of another high school student, whom they also stabbed.

The other stabbing victim was taken to a hospital, and later that night Afoa went there. Daniela arrived soon after and had an angry verbal confrontation with Afoa. Her cell phone records showed that earlier that night, she had sent a text message to Howard, who did not respond, that said, " 'Justice is at a party that I'm at right now.' "

In early November, during an exchange of text messages with someone with the last name Rosas, who was apparently another student, Daniela bragged that Tovar was going to kill in retaliation for having been assaulted. When Rosas said he " 'heard [someone] was gonna get stabbed or something like dat,' " Daniela responded, " 'Yeah, that's the nigga Justice. That's the nigga that jumped Rafa.' " About a month later, someone with the last name Lara sent Tovar a text message asking, " '[S]up wit dat

5

murdah, primo?,' " to which Tovar responded that he would get in touch after he was done with work.

Five days later, on December 15, 2010, Afoa was stabbed to death on a Newark street corner a few blocks from Tovar's and Daniela's home. Around 3:40 p.m., soon after school ended at Newark Memorial, witnesses saw two men attack Afoa as he said, "I didn't do anything." The men, who were described as "Hispanic," over six feet tall, slender, and wearing black hooded sweatshirts, then ran from the area.[6] Two of the witnesses were shown photographic lineups containing photographs of Howard and Tovar but did not identify either as being one of the men who murdered Afoa.

A Newark police detective with training in "the analysis of cell phone call records and the towers that those cell phones hit" testified that Howard's cell phone records showed that Tovar called Howard approximately 20 minutes before Afoa's murder, when Howard was near his home in Fremont, and the call lasted six minutes. About a minute later, Howard called Tovar back, and when that call ended, about ten minutes before the murder, the records indicated that Howard was close to both Tovar's and Daniela's house and the location of the murder. Tovar's cell phone records indicated that Tovar was also near his home and the murder's location around the time of the murder. The detective acknowledged that the tower data did not allow him to pinpoint exact locations but only to determine locations within a radius of anywhere from less than a mile to three miles.

The only defense witness was Howard's sister. She testified that in late 2010, she and Howard were both living at their parents' house in Fremont and helping to care for their mother, who had Alzheimer's disease. Howard "was there almost every day helping feed [their mother], bathe her, give her medicine." His sister denied seeing any gang members, including Tovar, ever came to their house or seeing Howard display gang signs or wear gang paraphernalia. She also stated that during this time period, Howard had

---

[6] A stipulation was entered that at the time of trial in May 2013, Howard was five feet, ten inches tall and weighed 175 pounds. He is Caucasian.

multiple phones and that she eventually stopped trying to call him because "other people would answer or he would say he didn't have a phone, he'd lost another phone."

Howard's sister testified that Howard was at home during the afternoon of Afoa's murder and gave two reasons for her recollection. She explained that after their mother returned home from being hospitalized in late November, they started a log at the direction of a nutritionist to track everything that she ate. An entry for 12:00 p.m. on the day of Afoa's murder indicated that their mother had been given "eggs and bacon, milk, toast, jam." Howard's sister recalled that Howard had given their mother "almost a plate" of bacon, which was against the nutritionist's directions because hard foods could cause choking, and their father had later yelled at him about it.

Howard's sister also remembered that she had left work early that day and arrived home around 1:00 p.m. She had some personal things to take care of before leaving on a vacation, including a hair appointment at a salon in San Ramon scheduled for 5:30 p.m. Before she left for the appointment, Howard helped her "get [their] mom squared away" by bathing her, dyeing her hair, changing her clothes, and painting her nails. Howard's sister agreed that she was "absolutely sure" that Howard was at home with their mother when she left for the appointment at 4:00 p.m. The jury was shown two documents from the salon indicating that Howard's sister had an appointment there at 5:30 p.m. on December 15.

### 2. Gang evidence.

Detective Andrew Gannam of the Union City Police Department testified as a gang expert. He explained that FMT is a street gang in Fremont with 400 to 450 members. Although FMT "is generally a Hispanic gang," it also has members of other races. FMT is a Norteño gang, meaning it is affiliated with the Nuestra Familia prison gang. FMT's "biggest rivals" are the various Sureño gangs, and as a Norteño gang, FMT uses common Norteño signifiers like the color red and symbols that refer to the fact N is the fourteenth letter of the alphabet. These include the number 14, the Roman numeral XIV, and a grouping of one dot and four dots. FMT engages in extensive criminal activity, including murder, assault, and robbery.

7

Detective Gannam opined that both Tovar and Howard were FMT gang members at the time of Afoa's murder. Tovar identified himself as a Norteño and FMT member when being admitted to county jail in March 2010 and November 2012, "ha[d] been arrested for gang-related crimes in the past," had ongoing contact with other known gang members, and had many gang-related tattoos, including "FMT," "East Bay," "XIV," and "X4." In 2008, Tovar was found in possession of a drawing that included several gang-related symbols, including the phrase "death before dishonor," which Gannam explained was a common gang slogan referring to the importance of honor in Norteño culture and gang members' belief that "[a]ny sign of disrespect towards them or their gang has to be answered and answered violently."

Howard had several tattoos suggestive of gang membership, including "Bay Area Warrior," the Bay Bridge, a Huelga bird (a symbol Norteños have co-opted from the United Farm Workers), and a "key lock" indicating previous incarceration across his chest, and "East Bay" and "Fremont" on his back. In addition, he was involved in previous gang-related incidents. In February 2001, Howard, Tovar, and another Norteño gang member were driving through an area of Fremont claimed by a Sureño gang and engaged in a confrontation with two Sureños, who threw rocks at Howard's vehicle. Howard got out and chased one of the rival gang members while shooting at him. In May 2003, Howard confronted a woman in a Mountain View 7-Eleven store whom he recognized as Sureño-affiliated. He threatened to assault her, "called her a 'scrap bitch,' " a derogatory term for Sureños, and said, "[I]t's all about FMT."

Howard also had a history of assisting other gang members. At some time after Tovar's and Daniela's cousin was incarcerated, the cousin was taped describing how Howard helped him to escape when there was an "active manhunt" for him involving several different agencies. On another occasion in October 2012, police officers saw Howard with another FMT member. While the other gang member, who had an outstanding arrest warrant, fled, Howard "became aggressive" with one of the officers, thus "assisting the individual who[ was] fleeing by creating a disturbance for the police officers who [were] trying to catch him." Although Howard claimed when arrested in

8

2012 that he was a "drop out" of FMT and no longer involved with the gang, Detective Gannam opined that it was highly unlikely a drop out would be associating with members of his prior gang because "[i]t's very common for drop outs to be violently attacked and killed."

Finally, Detective Gannam testified that he believed Afoa's murder was gang-related. He explained that assaulting a gang member not only on his turf but at his actual home is "an extreme sign of disrespect" to both the individual gang member and his gang as a whole, "one that has to be answered violently." The fact that Afoa and his friends were significantly younger than Tovar, "an older guy, well respected within the gang," would have also increased the perceived need to retaliate. According to Gannam, by killing Afoa, FMT members would "[raise] the level of respect back up" by showing that "[y]ou jump them or you get into some sort of disrespectful issues with them and they'll kill you." An additional indication that Afoa's murder was gang related was that a memorial at the site where he had died had been defaced with "XIV" markings on pictures placed there, which indicated that Norteños were "claiming responsibility for the murder . . . [and] disrespect[ing] their victim[]."

B.     *The Attempted Murders of A.R. and Her Unborn Child.*

A.R. met Howard a few months before Afoa's murder, and she and Howard began dating. During the summer of 2012, she became pregnant with Howard's child. Howard soon started to question whether he was the baby's true father.

In late November 2012, A.R. and her 17-year-old son, who both lived in San Jose, spent the night at Howard's house in Fremont. The next night, a Sunday, A.R. told Howard that she wanted to go home, because she needed to do laundry and get ready for the upcoming week. Howard said, "[N]o, you're not going home," and refused to give her the keys to the vehicle they shared. The two went outside, and as A.R. kept asking to go home, Howard forced her toward a shed on the property that was about 100 to 150 feet away from the house's front door.

Once they were inside the shed, Howard began asking A.R. whether Tovar was the father of her child, questioning apparently prompted by information he received earlier

9

that day from a woman with whom Tovar had a sexual relationship. Howard tied A.R.'s hands behind her back with plastic zip ties and continued to ask her if she had slept with Tovar, which she repeatedly denied. A.R. testified that she felt "concerned" because she wanted to go home but was not yet afraid. Even though several of Howard's family members were in the house, she did not call out because she thought the situation would resolve itself, and she did not want to involve anyone else. At one point, she heard Howard's father coming toward the shed and asking Howard where some keys were, but she remained silent as Howard told him it was not a good time.

After they had been in the shed for about 20 minutes, Howard took A.R. outside to a tree about 40 feet away that had a rope hanging from it.[7] Howard then told A.R. "he was going to hang [her] from the tree." In an interview with a police detective after the incident, A.R. said that Howard threatened to kill both her and her son, although at trial she claimed she could not remember whether any such threats were made.

A.R was seated on a canister near the tree that allowed her feet to touch the ground. Howard knotted the rope, placed it around A.R.'s neck, and asked her again whether she had had sex with Tovar. He then went inside the house, telling A.R. that he was going to get a cigarette.

After Howard left, A.R. was able to grab her cell phone from her back pocket and call 911. She told the operator that her boyfriend was trying to kill her and gave the house's address. After A.R. hung up, Howard reappeared and offered her a cigarette, asking her "if [she] wanted [her] last cigarette." A.R. testified that she felt "numb" and was "just . . . waiting for the cops to come."

Soon thereafter, A.R. saw two police officers in the front of the house and yelled out to them. The officers went to the backyard and saw A.R. According to the officers' testimony, Howard was standing behind A.R. with his arm around her, and a rope was wrapped around A.R.'s neck and tied to the tree. It appeared that A.R. "was in danger of

---

[7] A.R. testified that "there was always a rope on the tree" since she "first went into the house" and later clarified that she had seen the rope on the tree before the day in question.

hanging," and the officers ordered Howard to get away from her. The officers testified that in response, Howard began winding more rope around A.R.'s neck. A.R., on the other hand, claimed at trial that Howard "was taking the rope *off* [her] neck." (Italics added.)

As the officers approached, they saw Howard push A.R. toward a steep embankment that was next to the tree and begin to run. A.R. was able to catch herself and sink to her knees, which caused the rope to tighten around her neck but allowed her to avoid a fall of several feet over the embankment that would likely have strangled her. A.R. was taken to the hospital with bruises and abrasions but had not sustained any serious injuries. Howard was soon apprehended in a neighbor's yard.

In an interview with a district attorney investigator a couple days later, A.R. agreed that she was "familiar with a football player being killed in Newark." She explained that she had seen a memorial to the player when driving to Tovar's house and that Howard later took a mural painted on wood from the memorial and cut it up to build storage at a store he had opened. In addition, the night before the hanging incident, A.R. and Howard went to the shed, where Howard smoked methamphetamine. A.R. stated that Howard was crying and said, "[T]he kid disrespected Rafael's sister," which she interpreted to mean that Tovar had killed the football player and Howard had helped.

## II.
### DISCUSSION

A. *The Trial Court Did Not Err by Admitting A.R.'s Testimony that She Interpreted Certain Statements by Howard to Mean He Was Involved in Afoa's Murder.*

A.R. expressed her belief that Howard was involved in Afoa's murder in both her trial testimony and in a recording of her interview with the district attorney investigator, which was played for the jury. Howard claims that these statements were improperly admitted into evidence because they constituted inadmissible lay opinion. We disagree.

At trial, the prosecutor asked A.R. whether Howard had "sa[id] something to [her] that left [her] with the impression that he had assisted . . . Tovar in killing . . . a high school football player." She responded that Howard had said, "[T]he kid disrespected his

11

sister," and she "assumed" Howard meant Tovar's sister although Howard "never said any names." After the prosecutor asked her why "that conversation left [her] with the impression that [Howard] was telling [her] that [Tovar] killed the kid and [Howard] assisted," Howard objected that the question called for speculation, and the trial court overruled the objection. Although she did not answer the objected-to question, A.R. later agreed that she had told the district attorney investigator that the conversation "made [her] believe that [Tovar] did kill the kid and that [Howard] assisted."

An audio recording of A.R.'s interview with the district attorney investigator was also played to the jury. In the interview, A.R. stated that she became aware Howard was connected to the "football player [who] got killed" because Howard had taken a mural from the victim's memorial site. She also stated that "one time [Howard] was crying, and he said that the kid disrespected [Tovar]'s sister. And . . . he didn't use the exact words, but he made me believe that [Tovar] did kill that kid and that [Howard] assisted." Finally, she told the investigator that Howard said "he was going to kill Rafael," although she testified at trial that she could not remember whether Howard had threatened Tovar.

A lay witness's opinion testimony must be "[r]ationally based on the perception of the witness . . . and . . . [h]elpful to a clear understanding of [the witness's] testimony." (Evid. Code, § 800, subds. (a) & (b).) In addition, a witness must have "personal knowledge of [a] matter" to testify about it. (Evid. Code, § 702.) Thus, " '[a]n examiner's question asking a lay witness . . . to state an opinion not based on his or her own observations [] calls for speculation and conjecture by the witness and is prohibited by' Evidence Code sections 702 and 800." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 631.) We review the trial court's determination whether a question calls for speculative lay opinion for an abuse of discretion. (*People v. Thornton* (2007) 41 Cal.4th 391, 429.)

The Attorney General contends Howard forfeited this claim because he objected "on the ground of speculation, not improper lay opinion." We disagree that this objection amounted to a forfeiture. Howard's position on appeal is that A.R.'s testimony was improper lay opinion *because* it was speculative. Although other types of testimony may

12

also be speculative, Howard was not required to specify that the question called for lay opinion testimony to fairly present the issue to the trial court.

Turning to the merits, we observe that the premise of Howard's claim is that A.R.'s testimony amounted to an opinion that his statement constituted "an admission that [Howard] assist[ed] . . .Tovar in killing the football player." But even if we accept this characterization of A.R.'s testimony, we are not persuaded that the trial court abused its discretion in overruling Howard's objection.

Howard cites two cases in support of his argument that A.R.'s opinion was speculative because it was based on her "impression." In *People v. Edwards* (2013) 57 Cal.4th 658, the defendant made an offer of proof that a witness had an " 'impression' " that the victim had removed the key to her apartment from its hiding place because her daughter would sometimes enter the apartment without her permission, providing "an alternate explanation for [the victim's] missing jewelry" and undermining the daughter's credibility. (*Id.* at pp. 670, 674, 727.) In rejecting the defendant's claim that the witness's " 'impression' " should have been admitted as a lay opinion, our state Supreme Court stated that "[t]he opinion was wholly speculative, not '[r]ationally based on the perception of the witness.' " (*Id.* at p. 727, quoting Evid. Code, § 800, subd. (a).)

Unlike the witness in *People v. Edwards*, *supra*, 57 Cal.4th 658, A.R. actually testified at trial, and her statements to the district attorney investigator were also played for the jury. Thus, several details to support her interpretation of Howard's statement were introduced, not just the bare assertion of what she thought the statement meant. The evidence indicated that A.R. knew Howard and Tovar were close friends, that she already associated Howard with Afoa's killing because Howard had taken the mural from the memorial site, that Howard was crying when he made the statement, and that Howard was angry with Tovar because he believed Tovar might have impregnated A.R. These details supported A.R.'s interpretation of Howard's statement, and the trial court did not abuse its discretion by determining that the interpretation was "[r]ationally based on [A.R.'s] . . . perception." (Evid. Code, § 800, subd. (a).)

13

Howard also cites *People v. Thornton*, *supra*, 41 Cal.4th 391, where, after defense counsel asked a witness "if it appeared from the vehicle occupants' behavior that they knew each other," the trial court sustained the prosecutor's objection that the question called for speculation. (*Id.* at p. 428.) The witness was a stranger who did not know the vehicle's occupants, the victim and the defendant. (*Id.* at p. 427.) In affirming the trial court's evidentiary decision, the *Thornton* court refused to "second-guess the [trial] court's ruling . . . that the question called for a conjectural lay opinion" and was thus "not . . . '[h]elpful to a clear understanding of [the witness's] testimony.' " (*Id.* at p. 429, quoting Evid. Code, § 800, subd. (b).) But in contrast to the *Thornton* witness, who was asked to opine on the relationship between two people she did not know, A.R. knew Howard well and her interpretation of his statement was grounded on facts known to her. Moreover, as did *People v. Edwards*, *supra*, 57 Cal.4th 658, *Thornton* affirmed a trial court's exclusion of evidence. Its holding that the trial court did not abuse its discretion in *excluding* the evidence does not amount to a ruling that the trial court would have necessarily abused its discretion if it had *admitted* the evidence.

Howard also relies on decisions establishing that a witness may not offer an opinion on a defendant's guilt or innocence. (*People v. Torres* (1995) 33 Cal.App.4th 37, 46-47; *People v. Mason* (1960) 183 Cal.App.2d 168, 173.) As *Torres* explains, however, the rationale for this principle is not that such opinions are speculative—that is, not based on the witness's personal knowledge—but that they "are of no assistance to the trier of fact . . . [because it] is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." (*Torres*, at p. 47.) Thus, these decisions are unhelpful in evaluating whether A.R.'s opinion that Howard admitted to helping Tovar kill Afoa was speculative. We conclude that the trial court did not abuse its discretion in admitting the challenged testimony.

Even if we were to conclude that A.R.'s opinion testimony should not have been admitted, we would also conclude that any such error was harmless. Howard had and exercised the opportunity to cross-examine A.R. on the basis for her opinion. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 84.) Moreover, there was significant other

14

evidence of Howard's involvement in Afoa's murder, particularly Howard's exchange of text messages with Daniela and cell phone records. Therefore, it is not reasonably probable that the jury would have reached a more favorable result had the error not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Bradley*, at p. 84.)

> B. *Howard's Contention that Certain Statements by Tovar and Daniela Were Improperly Admitted Hearsay Lacks Merit.*

Howard contends the trial court erred by admitting hearsay evidence consisting of statements made by (1) Tovar during the telephone conversation with his and Daniela's imprisoned cousin and in text messages with Lara; (2) Daniela during the same telephone call; and (3) Daniela to Daniel R. and in text messages with Rosas. We disagree.

Before trial, the prosecution moved to admit the challenged evidence as statements of coconspirators under Evidence Code section 1223 (section 1223) and as statements against penal interest under Evidence Code section 1230 (section 1230). Howard argued that a conspiracy had not been established and that the statements were made neither in furtherance of such a conspiracy nor against penal interest. The trial court ruled the evidence was admissible under both sections 1223 and 1230. In doing so, it specifically found that Tovar and Daniela were unavailable as witnesses because they were awaiting trial in separate matters.

Under section 1223, a hearsay statement by a coconspirator is admissible against a defendant if " 'independent proof of a conspiracy [is] shown' " and the following facts are demonstrated: " ' "(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the [defendant] was participating or would later participate in the conspiracy." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 871; § 1223.)

Under section 1230, a hearsay statement "by a declarant having sufficient knowledge of the subject" is admissible as a statement against penal interest "if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected [the declarant] to the risk of . . . criminal liability . . . that a reasonable [person] in [the

15

declarant's] position would not have made the statement unless he [or she] believed it to be true." (§ 1230.)  In addition to demonstrating that " 'the declarant is unavailable . . . [and] that the declaration was against the declarant's penal interest when made,' " the party seeking to admit such evidence must show " 'that the declaration [is] sufficiently reliable to warrant admission despite its hearsay character.' " (*People v. Brown* (2003) 31 Cal.4th 518, 535.)

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)  Applying this standard, we overturn those rulings only if the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)  The court's "determination of preliminary facts" necessary to establish an exception to the hearsay rule "will be upheld if supported by substantial evidence." (*People v. Brown*, *supra*, 31 Cal.4th at pp. 540-541.)

        1.     Howard's claim as to Tovar's statements fails.

Howard challenges the admission of two exchanges involving Tovar.  The first, during the September 2010 telephone call with Tovar's and Daniela's cousin in prison, went as follows:

> [COUSIN]:  Hey, and was Danny in the house earlier?
>
> [TOVAR]:  Yeah.
>
> [COUSIN]:  Yeah?
>
> [TOVAR]:  Mm-hm.
>
> [COUSIN]:  So everything is good?  Are you guys going to take care of that?
>
> [TOVAR]:  Yeah, it's all good.

Although Howard states in a subheading of his briefing that Tovar's statements during this call "did not further the conspiracy and were not against [Tovar]'s interests," Howard does not actually argue either point.  (Capitalization omitted.)  He has therefore forfeited his challenge to this exchange.  (See *People v. Holford* (2012) 203 Cal.App.4th

155, 186 [conclusory assertion of error forfeited where unsupported by "reasoned argument or citation to authority"].)

The second challenged exchange consists of a text message from Lara to Tovar stating, "[S]up wit dat murdah, primo?" and Tovar's response stating, "I'm working. I'll hit you when I get out." Howard argues the statements were inadmissible under section 1223 because they were not in furtherance of a conspiracy to kill Afoa and were inadmissible under section 1230 because an admission of knowledge of a murder is not a statement against penal interest. We conclude that the trial court did not abuse its discretion by admitting the statements under section 1230, and we therefore do not address whether they were also properly admitted under section 1223.

Although neither party raises the issue, we take a moment to address the threshold issue of whether the two text messages are actually hearsay. Lara's question does not make any express assertion of fact. (See *People v. Jurado* (2006) 38 Cal.4th 72, 117 ["a request, by itself, does not assert the truth of any fact . . . [and] cannot be offered to prove the truth of the matter stated"].) A question may still be hearsay, however, " 'if such evidence is offered to prove—not the truth of the matter that is stated in such statement expressly—but the truth of a matter that is stated in such statement by implication.' " (*People v. Garcia* (2008) 168 Cal.App.4th 261, 289.) For example, in *People v. Morgan* (2005) 125 Cal.App.4th 935, the Court of Appeal held that a declarant's question whether the person who answered the defendant's telephone had any drugs was hearsay because the question was relevant only to the extent it implied the declarant wanted drugs and believed they could be obtained by calling the defendant. (*Id.* at pp. 939, 943.) Similarly, Lara's question was relevant only to the extent it implied a murder was planned and Tovar was involved. And although Tovar's response was not introduced for the truth of the matter *directly* asserted—that he was at work and would contact Lara after he was done—it was also relevant to the extent it implied that Tovar was, in fact, involved in a murder. Thus, we conclude both statements are hearsay.

In arguing that the statements were inadmissible under section 1230, Howard relies on *People v. Alexander* (2010) 49 Cal.4th 846. In that case, our state Supreme

17

Court held that the trial court did not abuse its discretion by refusing to admit under section 1230 a witness's proffered testimony that a man other than the defendant had "told [the witness] 'he knew about' the murder" with which the defendant was charged. (*Alexander,* at pp. 855, 915-916.) Emphasizing that the witness claimed the other man said only that he knew about the murder, not that he was involved in it, the Supreme Court observed, "Merely knowing about a murder is not a crime, and it follows that admitting to someone that one knows about a murder is not a statement against one's penal interest, or any other interest listed in section 1230." (*Id.* at p. 916.)

We disagree with Howard that the statement here merely suggested that Tovar knew about some unidentified murder and was therefore not against his penal interest. A plausible interpretation of Tovar's and Lara's exchange, given that Afoa was killed five days later and that there was other evidence Tovar planned to retaliate against him, is that Tovar was actively planning Afoa's murder. Indeed, Howard also argues that Tovar's statement to Lara "served exactly the image Tovar wanted to project—that he was a tough gang member who would not let a prior act of disrespect go unavenged," thus acknowledging the possibility of viewing the exchange as indicating Tovar did not just know about the murder but was involved in it. As a result, *People v. Alexander*, *supra*, 49 Cal.4th 846 is distinguishable, and the trial court did not abuse its discretion by determining that the statements were against Tovar's penal interest.

Even if the admission of Tovar's and Lara's exchange was error, it was harmless. The text messages tended to establish the existence of a conspiracy to kill Afoa in which Tovar was involved, but the conspiracy was supported by other significant and more direct evidence. In addition, the exchange did not implicate Howard whatsoever. As a result, we conclude it is not reasonably probable that the verdict would have been different had the exchange between Tovar and Lara been excluded. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) And, to the extent Howard argues that the evidence's admission violated the federal Constitution's Confrontation Clause, we conclude that any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

2. Any error in the admission of Daniela's statements during the call with her and Tovar's cousin was harmless.

Howard next challenges the following exchange between Daniela and her and Tovar's cousin during the same September 2010 telephone call:

[COUSIN]: What happened?

[DANIELA]: Nothing. We just gotta find out who these people are.

[COUSIN]: Oh you guys don't know who it was?

[DANIELA]: I know who it was. I just want to find out who the bitch was.

[COUSIN]: The bi- there was a girl there?

[DANIELA]: Yeah.[8]

. . .

[COUSIN]: But [Tovar] knows who it was, right?

[DANIELA]: Yeah, we all know who it was. I just want to find out who the bitch is. 'Cuz I mean about the dudes, I can't do shit about the dudes 'cuz it's not like they can hit me back. But that bitch, I already got like fuckin' 10 girls to fuckin' be with me. Or by myself I'm not even trippin'. That bitch is fuckin' gonna get it. She don't even know. That bitch is not just gonna stand there and watch my brother get jumped. I will fuckin' kill you. You don't understand.

We need not determine whether the trial court properly admitted this exchange because any error was harmless. That Daniela and Tovar knew who had beaten Tovar was amply demonstrated by other evidence. And as Howard himself argues, Daniela's statements about her desire to determine which *girl* had been present and retaliate against her "were remote from any conspiracy to retaliate against Afoa." Taken as a whole, Daniela's statements were marginally relevant to the existence of a conspiracy to kill Afoa and did nothing to implicate Howard in such a conspiracy. As a result, we conclude it is not reasonably probable that the verdict would have been different had these statements been excluded and that any error was harmless beyond a reasonable doubt.

---

[8] At least one girl from Afoa's group of friends was present during the assault on Tovar.

(*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Duarte*, *supra*, 24 Cal.4th at pp. 618-619; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

> 3. Daniela's statements to Daniel R. and to Rosas were admissible as statements against penal interest.

Finally, Howard contends that Daniel R.'s testimony about statements Daniela made to her soon after Tovar was beaten and text messages Daniela exchanged with Rosas were inadmissible hearsay. We conclude this evidence was admissible as statements against penal interest under section 1230, and we therefore do not consider whether it was also admissible as statements of a coconspirator under section 1223.

Howard challenges the admission of Daniel R.'s testimony that Daniela said "that [Tovar] was working on something and he didn't want Daniela to open her mouth too quickly and start[] telling people he was out of the hospital. So they created a story of hi[s] being in [a] coma so that when anything did happen they wouldn't look at [him]. [¶] . . . [He] didn't want to get his hands dirty." Howard also challenges the admission of Daniel R.'s testimony that Daniela "portrayed to [her] that [Howard] would be the one handling it and Daniela would be the eyes pretty much," which Daniel R. interpreted to mean that Daniela "was in the streets with us, at school, events, parties. Daniela would know."

In addition, Howard challenges the admission of the text messages Daniela exchanged with Rosas. After the two discussed what was apparently a fight at school, the following exchange occurred:

> [ROSAS]: So yo brother still gonna get those niggas back?
>
> [DANIELA]: Yeee.
>
> [ROSAS]: They gonna kill em?
>
> [DANIELA]: Yeee.
>
> [ROSAS]: For real?
>
> [DANIELA]: Yeee. Ah, he a real OG.
>
> [ROSAS]: Damn, yo fucken brother my role model. Ha ha. He hella fuckin koo.

20

[DANIELA]: Haha, fasho.  He's mines too.

[ROSAS]:  So da football players after you o what?

[DANIELA]: Yee aha, but they bitchass niggas.

[ROSAS]:  Ayy, so why they think dat I was YNL.[9]  I heard one of his homies was gonna get stabbed or something like dat.

[DANIELA]: Yeah, that's the nigga Justice.  That's the nigga that jumped Rafa.

Howard argues that none of Daniela's statements were against penal interest or sufficiently trustworthy because they were merely the boasts of a teenage girl "trying to impress her friends in an environment where gang[]life was glamorized and gang members idolized."  First, we disagree that the statements were not against Daniela's penal interest, as they demonstrated participation in the conspiracy to kill Afoa.  The statements to Daniel R. implicated Daniela in both developing the coma story and helping Howard carry out the plan.  And the statements to Rosas, while not directly addressing Daniela's role, demonstrated her knowledge of specific details about the crime planned and therefore also tended to suggest she was involved in the conspiracy.

Second, we disagree that the statements were insufficiently trustworthy.  " 'To determine whether [a particular] declaration [against penal interest] passes [section 1230's] required threshold of trustworthiness, a trial court "may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." '  [Citation.]  We have recognized that, in this context, assessing trustworthiness ' "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." ' "  (*People v. Duarte*, *supra*, 24 Cal.4th at p. 614.)  Although " '[t]here is no litmus test for the determination of whether a statement is trustworthy,' " " 'the most reliable circumstance is one in which the conversation occurs between friends in a

---

[9] A Newark police detective testified that "YNL" refers to a Norteño gang called Young Newark Locos.

noncoercive setting that fosters uninhibited disclosures.' " (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 175.)  Here, Daniela made both sets of statements to friends in private conversation.  And both contained specific details of the conspiracy—the coma story, the role Daniela was to play, the plan to stab Afoa—that were corroborated by other evidence.  Despite the boasting tone of some of Daniela's statements, particularly to Rosas, we cannot conclude that the trial court abused its discretion by determining these statements were sufficiently trustworthy and admitting them under section 1230.

> C.       *The Jury Instruction Permitting Howard to Be Convicted of First*
>          *Degree Murder Based on the Natural and Probable Consequences*
>          *Doctrine Requires Reversal of That Conviction.*

Howard argues that his first degree murder conviction must be reversed because the version of CALCRIM No. 403 given to the jury permitted him to be convicted of first degree murder under the natural and probable consequences doctrine in contravention of *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*).[10]  We agree that the conviction cannot be sustained.

The jury was instructed under CALCRIM No. 403 that, "[to] prove that [Howard] is guilty of murder as alleged in Count 1," the People had to prove:  (1) he was "guilty of Assault with a Deadly Weapon in violation of . . . section 245[, subdivision] (a)(1)"; (2) "[d]uring the commission of Assault with a Deadly Weapon, a coparticipant in the assault committed the crime of murder"; and (3) "[u]nder all of the circumstances, a reasonable person in [Howard]'s position would have known that the commission of the murder was a natural and probable consequence of the commission of the Assault with a Deadly Weapon."  The instruction directed, "To decide whether the crime of Murder was committed, please refer to the separate instructions . . . on that crime."  In addition, the

---

[10] *Chiu*, *supra*, 59 Cal.4th 155 was decided after Howard filed his opening brief, and we granted his request to submit supplemental briefing on the decision's impact.  Given our conclusion that the instruction was erroneous under *Chiu*, we need not consider his original claim that the instruction was erroneous because it failed to specify that he could be convicted of first degree murder only if the jury found "that premeditated murder was in fact a reasonably foreseeable consequence of assault with a deadly weapon."  (Italics omitted.)

jury was instructed on the elements of assault with a deadly weapon under CALCRIM No. 875, which was modified to note that "Assault with a Deadly Weapon is referred [to] in Instruction 403."

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

The natural and probable consequences doctrine is a theory of vicarious liability applicable to both conspirators and aiders and abettors. (*Chiu*, *supra*, 59 Cal.4th at pp. 163-164; *People v. Prettyman* (1996) 14 Cal.4th 248, 261.) Under the doctrine, "a conspirator is vicariously liable for the unintended acts by coconspirators if such acts . . . are the reasonable and natural consequence of the object of the conspiracy." (*People v. Hardy* (1992) 2 Cal.4th 86, 188.) Similarly, an aider and abettor " ' "is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' " (*Chiu*, at p. 161.) The unintended crime is a "natural and probable consequence" of the intended crime "if, judged objectively, the additional offense was . . . a reasonably foreseeable consequence of the act [conspired to be committed or] aided and abetted." (*Id.* at pp. 161-162; *People v. Zielesch* (2009) 179 Cal.App.4th 731, 739.) Whether an offense is reasonably foreseeable is a factual issue for the jury to decide. (*Chiu*, at p. 162; *Zielesch*, at p. 739.)

In *Chiu*, *supra*, 59 Cal.4th 155, our state Supreme Court held that "an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Id.* at pp. 158-159, italics omitted.) We agree with Howard that the given version of CALCRIM No. 403, which addresses the aiding-

23

and-abetting variety of that doctrine (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 849) was erroneous under *Chiu* because it permitted him to be convicted of first degree murder if the jury found Afoa's murder was the natural and probable consequence of Howard's participation in assault with a deadly weapon. Nothing in the instruction informed the jury that Howard could be convicted of only *second* degree murder based on this theory of liability. To the contrary, the instruction referred to finding him "guilty of murder as alleged in Count 1" (i.e., first degree murder), and it told the jury "[t]o decide whether the crime of Murder was committed" based on the other instructions on murder given, CALCRIM Nos. 520 and 521, which address both first degree and second degree murder.

The Attorney General argues that there was no error because in *Chiu*, *supra*, 59 Cal.4th 155, the jury was instructed under CALCRIM Nos. 520 and 521 that the degree of murder for which the defendant was liable depended on which degree of murder the *perpetrator* committed (*Chiu*, at pp. 161-162), whereas here, the versions of those instructions given referred to Howard. The Attorney General reasons that, as CALCRIM No. 520 instructed the jury to decide first whether *Howard* committed murder and then what degree of murder it was, the jury must have "resolve[d his] aiding and abetting liability, if any, first, and then turn[ed] to CALCRIM No. 521 to decide the degree." In turn, as CALCRIM No. 521 instructed that first degree murder was established only if Howard acted willfully, deliberately, and with premeditation, the Attorney General posits that "it is not possible that the jury used someone else's premeditation and deliberation to find murder in the first degree."

We cannot accept this reasoning. *Chiu*, *supra*, 59 Cal.4th 155 held that an aider and abettor can *never* be found guilty of first degree murder based on the natural and probable consequences doctrine. CALCRIM No. 403, the challenged instruction, addresses the aiding-and-abetting variety of that doctrine, and we therefore fail to see how the jury could have properly relied on that instruction, regardless of what the general instructions on murder stated, to find Howard guilty of first degree murder. In any event, it is unlikely that the jury interpreted the instructions as the Attorney General suggests.

24

The challenged instruction required a finding that "a *coparticipant* in the assault . . . committed the crime of murder" and directed the jury that "[t]o decide whether the crime of Murder was committed" by "refer[ring] to the separate instructions . . . on that crime" (i.e., CALCRIM Nos. 520 and 521). (Italics added.) The jury could not have reasonably believed it was supposed to determine whether a coparticipant committed murder and then consider *Howard*'s mind state in determining the degree of murder committed by the other person.

We therefore turn to consider whether the error was prejudicial, and we conclude that it was. "When a trial court instructs a jury on two [or more] theories of guilt, one [or more] of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu*, *supra*, 59 Cal.4th at p. 167.) If we cannot "conclude beyond a reasonable doubt that the jury based its verdict on [a] legally valid theory," then we must reverse Howard's conviction for first degree murder. (*Ibid.*)

The Attorney General argues there was no prejudice because Howard's conviction of the conspiracy count established he had the intent to commit first degree murder and the jury therefore must have "based its verdict on the legally valid theory that [Howard] . . . necessarily [directly] aided and abetted premeditated murder." She relies on *Chiu*, in which our state Supreme Court indicated that "[a]iders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles." (*Chiu*, *supra*, 59 Cal.4th at p. 166.) The argument fails for two reasons. First, as we discuss in section II.D., the jury was erroneously instructed on the conspiracy count as well. Thus, we cannot rely on any finding the jury might have made in returning that conviction. Second, unlike in *Chiu* (*id.* at pp. 166-167), the jury here was never instructed on direct aiding and abetting liability. Instead, the only instruction on aiding and abetting given was CALCRIM No. 403, despite the fact that the Bench Notes to that instruction direct that CALCRIM Nos. 400 (Aiding and Abetting: General Principles) and 401 (Aiding and Abetting: Intended Crimes) are to be given before CALCRIM No. 403 is. (Bench Notes to CALCRIM No. 403.) In short, the jury was never given the option to

25

convict Howard of first degree murder on the theory he directly aided and abetted that crime.

The jury did receive correct instructions, CALCRIM Nos. 520 and 521, on the theory that Howard was a direct perpetrator of the murder. But the jury could not have accepted this theory since it found not true the allegation that he personally used a deadly weapon during the murder's commission. And, as we shall now explain, the other instructions the jury received addressing that crime presented invalid theories of liability.

As mentioned above, the natural and probable consequences doctrine also applies to conspirators. The jury was instructed under CALCRIM No. 417—the instruction on liability for the acts of coconspirators—that it could find Howard guilty based on his participation in a conspiracy to commit either murder or assault with a deadly weapon. As we discuss further in section II.D., however, the instruction incorrectly stated that it applied to the charge of conspiracy to commit murder, not the murder charge itself. In other words, the jury was instructed that it could find Howard guilty of *conspiracy to commit murder* if he conspired to commit murder or assault with a deadly weapon—not, as was intended, that he was guilty of *murder* if that crime was a natural and probable consequence of either type of conspiracy.[11] Moreover, even if the instruction had referred to the proper charge, it may well have violated *Chiu*, *supra*, 59 Cal.4th 155 because it would have permitted Howard to be convicted of first degree murder as a natural and probable consequence of a conspiracy to commit assault with a deadly weapon. Although we need not decide the issue here, we note that another Court of Appeal has extended *Chiu* to the conspiracy variety of the natural and probable consequences doctrine. (*People v. Rivera* (2015) 234 Cal.App.4th 1350, 1355-1356

---

[11] The first sentence of CALCRIM No. 417, which was read to the jury here, states, "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime." Read in isolation, this statement would seem to permit the jury to conclude Howard was guilty of murder if it found he conspired to commit that crime. Given that the instruction refers to proving his guilt of only the conspiracy charge, however, we are unable to conclude that the jury relied on this sentence to convict him of first degree murder.

[reversing conviction for first degree murder where jury instructed that conviction could be based on finding that murder was natural and probable consequence of conspiracy to discharge firearm at occupied vehicle].)

Finally, the only other instruction involving the murder charge was also incorrect. The trial court gave a version of CALCRIM No. 415 that provided, "I have explained that [Howard] may be guilty of a crime if he either [*sic*] commits the crime. He may also be guilty if he is a member of a conspiracy. [¶] Defendant Daniel Howard is charged in Count 1 with murder in violation of Penal Code section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove [the elements of a conspiracy to commit murder]."[12] CALCRIM No. 415 is an instruction on the crime of *conspiracy*, however, not murder. Thus, to the extent the instruction's reference to "this crime" can be interpreted to refer to the murder count, the instruction erroneously permitted the jury to convict Howard of murder if it found he conspired to commit murder, even though the two crimes are distinct and have different elements.[13] (See *People v. Swain*, *supra*, 12 Cal.4th at p. 603 [murder requires killing whereas conspiracy " 'fixes the point of legal intervention at [the time of] agreement to commit a crime' "].)

In sum, we are unable to conclude beyond a reasonable doubt that the jury based the murder conviction on a legally valid theory. We therefore reverse Howard's conviction for first degree murder.[14] Because the instructional error Howard identified affects only the degree of murder of which he was convicted, the People will have the

---

[12] We requested and received supplemental briefing from the parties on whether this instruction was erroneous.

[13] Even if the Attorney General were correct that there is no reasonable likelihood the jury interpreted the instruction to refer to the murder count instead of the conspiracy count, we agree with Howard that CALCRIM No. 415 applies only to conspiracies to commit crimes other than murder and should not have been given at all. (See *People v. Cortez* (1998) 18 Cal.4th 1223, 1226-1227; *People v. Swain* (1996) 12 Cal.4th 593, 602-603; Bench Notes to CALCRIM No. 415.)

[14] In light of this conclusion, we need not consider Howard's claim that his conviction of first degree murder must be reversed because the trial court failed to instruct the jury on the lesser included offense of second degree murder.

option of either retrying him for first degree murder or accepting a modification of the judgment to reflect a conviction for second degree murder.[15]  (*Chiu*, *supra*, 59 Cal.4th at p. 168; *People v. Edwards* (1985) 39 Cal.3d 107, 118.)

### D. Howard's Conviction for Conspiracy to Commit Murder Must Be Reversed Because of Prejudicial Instructional Error.

Howard claims that his conspiracy conviction must be reversed because the trial court erred by instructing the jury "that it could convict [him] of conspiracy to commit murder as a natural and probable consequence of a conspiracy to commit an assault with a deadly weapon."  (Italics omitted.)  He argues that although a coconspirator "is vicariously liable for the foreseeable, but unintended completed crimes committed by other conspirators, . . . the liability does not extend to other possible conspiracies."  We agree.

As mentioned above, the jury was instructed under CALCRIM No. 417 on liability for the acts of coconspirators.  But instead of being instructed that Howard was guilty of the *murder* charge if the killing was a natural and probable consequence of a conspiracy to commit murder or assault with a deadly weapon in which he participated, the jury was instructed that he was "guilty of the crime charged in Count 2"—the *conspiracy* charge— if (1) he "conspired to commit one of the following crimes:  Assault with a Deadly Weapon or Murder"; (2) "[a] member of the conspiracy committed Assault with a Deadly Weapon to further the conspiracy"; and (3) "Murder was a natural and probable consequence of the common plan or design of the crime that [Howard] conspired to commit."  When reading the instruction, the trial court initially correctly referred to "Count 1," the murder charge, but it then stated, "I think there's an error because I don't think that's alleged in Count 1.  I think conspiracy is Count 2."

---

[15] At oral argument, Howard argued that we should simply reverse the murder conviction instead of permitting a modification to second degree murder, because the instructional errors and alleged evidentiary errors collectively denied him due process.  We disagree, and we decline his invitation to impose such a remedy for error under *Chiu*, *supra*, 59 Cal.4th 155.

28

Thus, the jury was instructed that it could find Howard guilty of conspiracy to commit murder if he conspired to commit assault with a deadly weapon, a coconspirator committed assault with a deadly weapon to further the assault conspiracy, and murder was a natural and probable consequence of the assault conspiracy. This was legally erroneous, because a conspiracy to commit murder requires proof of intent and agreement to *murder*. (*People v. Cortez*, *supra*, 18 Cal.4th at p. 1232.)

The Attorney General claims there was no error because the jury was properly instructed under CALCRIM No. 563 "that in order to find [Howard] . . . guilty of conspiracy to commit murder it had to find that [he and his coconspirators] agreed to commit that offense and possessed the specific intent to kill." Although it is true that the jury received the correct instruction on the elements of conspiracy to commit murder, the reference to the wrong count in CALCRIM No. 417 transformed that instruction into one on an alternate theory of liability for conspiracy to commit murder. When instructions are given on multiple theories of liability for the same crime, a reasonable jury would not conclude that it had to find the requirements of *every* theory met to return a conviction for that crime.

The Attorney General also argues that there was no error because "the jury had no cause to find that CALCRIM No. 417 applied in this case," as that instruction involves liability for "an independent criminal act by a coconspirator," whereas Tovar, Daniela, and Howard "clearly planned the most violent and lethal retaliation [for Tovar's beating] possible: murder." This argument really goes to the issue of prejudice, not error: the likelihood that the jury relied on CALCRIM No. 417 has nothing to do with whether the instruction correctly stated the law. We conclude that the trial court erred by referring to the wrong count in the version of CALCRIM No. 417 it gave.

In assessing whether the error was prejudicial, our task is again to determine whether "there is a basis in the record to find that the verdict was based on a valid ground" instead of the legally incorrect theory. (*Chiu*, *supra*, 59 Cal.4th at p. 167.) And if we cannot "conclude beyond a reasonable doubt that the jury based its verdict on [a]

29

legally valid theory," then we must reverse Howard's conviction for conspiracy to commit murder. (*Ibid.*)

The Attorney General argues that any error was harmless because "the evidence overwhelmingly established that [Howard] and his coconspirators specifically intended to kill . . . Afoa." We disagree. The evidence that Howard agreed to a plan to *kill* Afoa was far from overwhelming. Howard's own statements implicating him in the conspiracy, particularly the text messages Howard sent to Daniela, strongly suggest that he intended to harm Afoa in some way, but none of the evidence directly demonstrates that he intended to kill Afoa. And although the evidence that Tovar and Daniela planned to kill Afoa was strong, there was likewise no direct evidence that Howard knew that was their aim. In any event, any evidence tending to establish a conspiracy to commit murder was not inconsistent with the existence of a conspiracy to commit assault with a deadly weapon. Thus, regardless of the strength of the evidence that Howard conspired to commit murder, that evidence would not provide a basis for concluding beyond a reasonable doubt that the jury convicted him of the conspiracy count under CALCRIM No. 563—the only correct instruction on the conspiracy count given—instead of an erroneous instruction.

The Attorney General also argues there was no prejudice because the jury found Howard guilty of first degree murder, and the finding of premeditation "is inconsistent with a plan to assault rather than kill." This contention fails because we reverse Howard's murder conviction. As we are unable to perceive any other basis on which to conclude that Howard was found guilty of conspiracy to commit murder on a valid theory of liability, we conclude the conspiracy conviction must be reversed as well.

### E. The Trial Court Properly Declined to Sever the 2012 Counts from the 2010 Counts, and Joinder Did Not Deprive Howard of a Fair Trial.

Howard claims that his convictions of the 2012 attempted murders of A.R. and her fetus must be reversed because the trial court erroneously denied his motion to sever those and the related 2012 counts from the counts related to Afoa's 2010 murder. He

30

also claims that even if the court properly denied the motion, his convictions of the 2012 counts must be reversed because "joinder . . . resulted in a gross unfairness and denial of due process." We disagree.

Before trial, Howard moved to sever the 2010 counts from the 2012 counts. He argued that severance was required because there was no overlap in the evidence, the gang evidence was inflammatory, and the prosecution's cases as to both sets of counts were weak. The prosecution responded that joinder was proper under section 954 because the crimes were of the same class and Howard failed to show sufficient prejudice, since A.R.'s statements about Afoa's murder were cross-admissible, both sets of counts were equally inflammatory, and both cases were strong.

The trial court denied the motion. It found that "[t]here [was] cross-admissibility of the evidence because there [was] going to have to be evidence of [Howard and Tovar's] relationship, which would include the gang affiliation, among other things, and their relationships with respect to [Afoa's murder] as it related to the reason why [Howard] would commit the second crime and his relationship with Tovar as to his belief that in fact [Tovar] was the one who impregnated [A.R.]." The court also "disagree[d]" with the defense's argument about the cases' relative merits.

Joinder of criminal counts for trial is permitted by section 954, which provides, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense, or two or more different offenses of the same class of crimes or offenses, under separate counts." (§ 954; *People v. Soper* (2009) 45 Cal.4th 759, 771-772 (*Soper*).) A trial court, "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (§ 954.)

Howard does not contend that the counts' joinder violated section 954. Instead, he argues that severance was necessary because of the joinder's prejudicial effect. A defendant seeking severance on this basis has the burden to show " 'a substantial danger of undue prejudice' " that outweighs " 'countervailing considerations [of efficiency and

31

judicial economy].' " (*Soper*, *supra*, 45 Cal.4th at p. 773, italics omitted.) "First, we consider the cross-admissibility of the evidence in hypothetical separate trials. [Citation.] If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Id.* at pp. 774-775.) Only "[i]f we determine that evidence underlying properly joined charges would *not* be cross-admissible [do] we proceed to consider" the issue whether a substantial danger of prejudice outweighs countervailing considerations in favor of joinder. (*Id.* at p. 775, italics in original.)

We review the denial of a severance motion for an abuse of discretion, considering the record before the trial court at the time it ruled. (*Soper*, *supra*, 45 Cal.4th at p. 774.) " '[E]ven if a trial court's ruling on a motion to sever is correct at the time it is made,' " however, " 'a reviewing court still must determine whether, in the end, joinder of the counts . . . for trial resulted in gross unfairness depriving the defendant of due process of law,' " which requires us to "[c]onsider[] the proceedings as a whole." (*Id.* at pp. 783-784.)

Howard claims the trial court incorrectly determined that the gang evidence was cross-admissible. In general, "evidence of gang membership and activity," like any other evidence, "is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative[,] and is not cumulative." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) Such evidence may be relevant to establish a variety of facts "other than criminal propensity," including motive. (*Id.* at pp. 223-224; see Evid. Code, § 1101.) "Nonetheless, even if [such] evidence is found to be relevant, the trial court must carefully scrutinize [it] before admitting it" because of its heightened potential to have an "inflammatory impact on the jury." (*Albarran*, at pp. 223-224; see Evid. Code, § 352.)

Although Howard makes the cursory assertion that "the gang evidence would not likely have been admissible" under Evidence Code section 1101 in a trial involving only the 2012 counts, he offers no reason that the trial court's determination that that evidence

was relevant to establish motive was erroneous. Instead, he focuses on the issue of undue prejudice, arguing that he "and Tovar were life-long friends and neighbors for much of their lives" and "[a]dditional explanation of the reason for [Howard's] anger" in the form of their affiliation with the same gang was unnecessary.

Moreover, in focusing on the gang evidence, Howard fails to address other evidence that the trial court also found cross-admissible. The court specified that it was denying the motion to sever based on the cross-admissibility of evidence of Howard's and Tovar's relationship generally, including the circumstances of Afoa's murder, not just the cross-admissibility of evidence of Howard's and Tovar's gang affiliation. Thus, even if the court's determination that the gang evidence was cross-admissible had been incorrect, Howard has offered no reason to upset the court's ruling as to the other evidence of his and Tovar's relationship. We conclude the court properly denied the motion to sever on the basis of the evidence's cross-admissibility.

Having determined that the trial court did not abuse its discretion when ruling, we turn to consider Howard's position that joinder nevertheless violated his due process rights based on the proceedings at trial. He claims that "[j]oinder resulted in admission of a significant amount of emotionally charged gang evidence" that "was likely the pivotal evidence" resulting in the jury's determination that Howard intended to kill A.R., not just scare her. We agree that the gang evidence tended to show that Howard was capable of forming the intent to kill, particularly given the incident in which he chased a rival gang member while shooting at him. We can also see how Howard's gang membership may have been suggestive, based on Detective Gannam's testimony that gang members tend to retaliate violently when they are disrespected, of an intent to kill A.R. in particular out of a belief that she had cheated with Tovar.

We disagree, however, that the gang evidence was likely *determinative* on the attempted-murder counts. Howard bound A.R.'s hands, marched her to a tree, tied a rope hanging from it around her neck, and pushed her toward a steep embankment, resulting in her nearly being hanged. Moreover, there was evidence that in the course of this incident, Howard specifically threatened to kill A.R. and asked her whether she wanted

33

her "last cigarette." Thus, even without Detective Gannam's testimony, there was strong evidence that Howard intended to kill A.R. We conclude Howard has failed to meet "his high burden of establishing that the trial was grossly unfair and that he was denied due process of law" as a result of the joinder of the 2010 and 2012 counts. (*Soper*, *supra*, 45 Cal.4th at pp. 783-784.)

F. *Sufficient Evidence Supports Howard's Kidnapping Conviction.*

Howard contends that his conviction for kidnapping A.R. must be reversed because there was insufficient evidence of the element of asportation. We are not persuaded.

Howard was convicted of simple kidnapping under section 207, which provides that "[e]very person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (a); *People v. Bell* (2009) 179 Cal.App.4th 428, 435.) The elements of simple kidnapping are: " '(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.' [Citation.] This last element, . . . that the victim be moved a substantial distance, is called the 'asportation' element." (*Bell*, at p. 435.)

A distance is " 'substantial' " if it is " 'more than slight or trivial.' " (*People v. Martinez* (1999) 20 Cal.4th 225, 237 (*Martinez*).) Whether movement is substantial is determined under "the totality of the circumstances," and "in a case where the evidence permitted, [a] jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Ibid.*) In addition, where, as here, the kidnapping is linked to another crime, "the jury should be instructed to consider whether the distance [the] victim was moved was incidental to the

commission of [the associated] crime in determining the movement's substantiality."
(*Ibid.*) But although the jury may consider these additional factors, "it may convict of simple kidnapping without finding . . . any other contextual factors . . . . At the same time, . . . contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance." (*Ibid.*)

To evaluate Howard's claim, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. . . . "We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Initially, we must address *which* movement of A.R. is at issue. Howard's claim focuses on the 40-foot movement from the shed to the tree, but the Attorney General argues that we may also consider the earlier 100- to 150-foot movement from the house to the shed.

We agree with Howard that the prosecutor elected to rely on only the 40-foot movement. "When an accusatory pleading charges the defendant with a single criminal act, and the evidence presented at trial tends to show more than one such unlawful act, either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the [trial] court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.) In closing argument, after mentioning the elements of simple kidnapping, the prosecutor argued as follows:

> "Here we have [A.R.'s] testimony that she went from the house to the shed, but [Howard] had her hands behind her back and he was forcing her out there. I know she says she kind of consented to walk out there, but what she was really saying is I didn't want to be out in that shed. She didn't want to continue the barrage of what was going on. *But when she*

*was moved from the shed to the tree she was moved a substantial distance.*
You saw the diagram of the officer where he put the shed. It wasn't trivial and it wasn't slight, but the main thing about it was it allowed for [Howard] to effectuate his plan. And the movement itself has to, in essence, make it much more dangerous for the victim in that the peril is increased by movement.

> . . . You are moved a substantial distance such that . . . the danger to you is enhanced. And that's what happened with that tree. When he moved her to that tree, the danger was increased because it allowed him to take the rope that was already hanging from the tree and put it around her neck. And she can dance around the consent issue [, but] . . . [t]hat's why you see bruises on her arms, because he's probably got her by the arm forcing her to that milk can, forcing her to her demise."

(Italics added.) Aside from the initial reference to the movement from the house to the shed, which he undercut by referring to A.R.'s testimony about consent, the prosecutor focused exclusively on the movement from the shed to the tree. In particular, he argued the issue of substantial distance only as to the latter movement. As a result, we will not consider the movement from the house to the shed in determining whether there was sufficient evidence of asportation.[16]

Howard argues that 40 feet is not a "substantial distance" as a matter of law, relying on decisions predating *Martinez*, *supra*, 20 Cal.4th 225 that held particular distances were insufficient to establish asportation. (*People v. Green* (1980) 27 Cal.3d 1, 65-67 [90 feet]; *People v. Daly* (1992) 8 Cal.App.4th 47, 55-57 [40 feet].) Before our state Supreme Court held in *Martinez* that asportation should be determined under the totality of the circumstances, that element of simple kidnapping was "exclusively dependent on the distance involved" under *People v. Caudillo* (1978) 21 Cal.3d 562. (*Martinez*, at p. 233.) But although "[t]he simple kidnapping standard remain[ed] 'substantial distance' " after *Martinez,* "in overruling *Caudillo* [the court] . . . not only

---

[16] It appears the jury may not have understood the exclusive reliance on the movement from the shed to the tree, as it sent a note to the trial court requesting "[t]estimony of [A.R.] regarding movement from the house to shed to the tree." This does not affect our analysis, however, as we conclude there is sufficient evidence that the shorter distance moved was "substantial" enough to establish asportation.

expanded the factual basis for making that determination but in the process effectively overruled cases holding that specific distances failed to establish asportation." (*Martinez*, at p. 239; see also *id.* at p. 236 ["[A]s we have historically recognized for both aggravated and simple kidnapping, limiting a trier of fact's consideration to a particular distance is rigid and arbitrary, and ultimately unworkable"].) Indeed, the court refused to apply its holding in *Martinez* retroactively to the defendant in that case and reversed the kidnapping conviction for insufficient evidence, determining that the movement was too short under prior law and *Martinez* "constitute[d] 'judicial enlargement of a criminal Act' " of which the defendant did not have fair warning. (*Id.* at pp. 239, 241.) In doing so, the court signaled that movements that were too short under prior law might well support a conviction after *Martinez*. Accordingly, we do not find the pre-*Martinez* decisions persuasive on the issue whether the movement here was sufficiently far.

Although *Martinez*, *supra*, 20 Cal.4th 225 dispensed with previous guidelines on the minimum number of feet required to establish asportation, the decision indicated that asportation cannot be established by "contextual factors, whether singly or in combination, . . . if the movement is only a very short distance." (*Id.* at p. 237.) Howard cites no authority, however, for the proposition that 40 feet can never be sufficiently far, regardless of any other factors, because it is "a very short distance." In fact, at least one post-*Martinez* decision has held there was sufficient evidence to support a conviction of simple kidnapping where the victim was moved an even shorter distance, 15 feet. (*People v. Arias* (2011) 193 Cal.App.4th 1428, 1435-1436.) We conclude that 40 feet is not too short as a matter of law to establish asportation.

Howard also claims that, even if 40 feet may be a sufficient distance otherwise, the other *Martinez* "factors weigh against finding the minimal distance [here] was otherwise substantial," as the evidence shows that A.R. "was moved from an isolated environment to an open, more public location where she was more readily seen and more likely to, and did get help." We disagree with Howard that the *Martinez* factors—including whether the movement decreases the possibility of detection and increases the risk to the victim— weigh against a finding that the movement here was substantial. (*Martinez*, *supra*,

37

20 Cal.4th at p. 237.) The shed was located by the front of the house, "near the sidewalk," whereas the tree was located in or near the backyard, and the responding officers saw the shed and determined no one was inside before they discovered A.R. by the tree. Thus, the jury could have reasonably determined that the tree was in a *less* public location than the shed. Moreover, the tree was next to a steep embankment. Howard's movement of A.R. there increased the danger to her in that she might fall when trying to escape or that Howard might push her off the side (as he in fact did).

Howard also argues that even if asportation were otherwise established, the conviction cannot be upheld because the movement of A.R. from the shed to the tree was incidental to the attempted murders. As stated above, *Martinez* held that "in a case involving an associated crime, the jury should be instructed to consider whether the distance a victim was moved was incidental to the commission of that crime in determining the movement's substantiality." (*Martinez*, *supra*, 20 Cal.4th at p. 237.) The court observed that "such consideration is relevant to determining whether more than one crime has been committed, and is amply supported by the case law," citing several earlier decisions. (*Ibid.*) Howard quotes language from one of those decisions, *In re Earley* (1975) 14 Cal.3d 122, 129, footnote 9, holding that defendants cannot be convicted of simple kidnapping when the asportation is " 'incidental' " to the associated crime. Under *Martinez*, however, whether a movement is incidental is "*not* a separate threshold determinant of guilt or innocence" under section 207 but only a factor bearing on the movement's substantiality. (*People v. Bell*, *supra*, 179 Cal.App.4th at p. 440, italics in original.)

Even if Howard's view of the law were correct, he fails to convince us that A.R.'s movement was incidental to the attempted murders. His only explanation of why the movement was incidental is that, "[b]ased on the evidence and the prosecutor's argument"—in which the prosecutor urged that the movement was substantial because it " 'allowed for [Howard] to effectuate his plan' " (italics omitted) and increased the danger A.R. faced—"walking from the shed to the tree was merely the movement necessary to effectuate the attempted murder [of A.R.]. There was no other purpose

suggested." It cannot be, however, that movement is incidental to an associated crime any time that the defendant undertakes the movement with the purpose of furthering that crime. If that were the case, then Howard could have transported A.R. to a location hundreds of miles away and would still not be guilty of simple kidnapping as long as he did so intending to murder her in that location. In addition, although the evidence is consistent with Howard's having formed the intent to kill A.R. before moving her to the tree, another reasonable inference is that he did not form that intent until afterward. He did not threaten to hang her or kill her until after they reached the tree, and there was no evidence he was the person who put the rope around it. It is possible that he intended to keep questioning her about Tovar in the more secluded location and changed his mind after the movement was complete.

In sum, there was sufficient evidence that Howard's movement of A.R. was substantial under the totality of the circumstances, and we therefore affirm the kidnapping conviction.

G. *Section 654 Does Not Require the Sentences for Criminal Threats and Kidnapping to Be Stayed.*

Howard claims that the sentences for criminal threats and kidnapping must be stayed under section 654 because both crimes were part of the same course of conduct as the attempted murder of A.R.[17] We disagree.

Section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The statute "generally precludes multiple punishments for a single physical act that violates different provisions of law [citation] as well as multiple punishments for an indivisible course of conduct that violates more than one criminal statute [citations]." (*People v. Newman* (2015) 238 Cal.App.4th 103, 111-112, italics omitted.) Even if convictions arise from the same

---

[17] Howard also contends that the sentence for conspiracy to commit murder should be stayed under section 654, a claim we need not reach because we reverse that conviction.

39

course of conduct, however, "section 654 [is] inapplicable . . . if the defendant ' "entertained multiple criminal objectives which were independent of and not merely incidental to each other . . . ." ' " (*Id.* at p. 112.)

We review the trial court's implicit determination that section 654 does not apply for substantial evidence. (*People v. Rodriguez* (2015) 235 Cal.App.4th 1000, 1005.) In doing so, we consider the court's finding " 'in the light most favorable to the respondent and presume the existence of every fact the . . . court could reasonably deduce from the evidence.' " (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.)

Howard argues that the attempted murder of A.R., the threat to kill her, and the kidnapping "were in furtherance of a single course of conduct" during which he had "only one objective, which was to pressure [her] into admitting that Tovar was the father of her baby." We cannot agree with this view of the evidence. Howard's intent in attempting to murder A.R. was to *kill* her, not to get an admission from her. Attempting to murder a person is, to put it mildly, counterproductive if one's aim is to obtain information from that person. The question, then, is whether there is substantial evidence that Howard committed the crimes of criminal threats and kidnapping in furtherance of an objective other than killing A.R., and we conclude there is.

As to the criminal threats, we find *People v. Solis* (2001) 90 Cal.App.4th 1002 persuasive. There, the defendant was convicted of arson and criminal threats after he left messages on the victim's answering machine threatening to kill the victim. (*Id.* at pp. 1008-1009.) The victim left her home and returned an hour later to discover that her apartment was on fire. (*Id.* at p. 1009.) The Court of Appeal rejected the defendant's argument that the two crimes "were committed pursuant to the same objective of threatening and scaring" the victim, because "they had distinct objectives: in making the terrorist threats, the defendant intended to threaten whereas in committing arson an hour later the defendant intended to burn." (*Id.* at p. 1022.) Similarly, here, there was substantial evidence to permit the conclusion that Howard had an objective in threatening A.R.—to scare her so she would disclose the baby's parentage—that had changed by the time he attempted to kill her.

Although the issue is closer as to the kidnapping, we likewise conclude that there was substantial evidence from which the trial court could determine that Howard did not move A.R. from the shed to the tree with the objective of killing her. He continued to question her about Tovar after moving her to the tree and tying the rope around her neck, and he did not attempt to kill her until after the police arrived. Thus, as we already concluded in our discussion of his previous claim, it is possible to infer that he did not form the intent to kill A.R. until sometime after he moved her to the tree. As a result, we conclude there was no error under section 654.

> H.     *The Strike Determination Must Be Reversed Because Howard Was Not Advised of the Constitutional Rights He Would Waive by Admitting to the Truth of the Prior Conviction.*

Howard challenges the determination that his prior conviction for assault with a firearm constituted a strike on the basis that the trial court failed to advise him of his constitutional rights before accepting his admission that he suffered that conviction. We agree that the strike determination must be reversed because the record does not allow us to infer that Howard knowingly waived his constitutional rights before admitting the truth of the prior conviction.

The operative version of the information alleged that Howard was convicted in April 2001 of the felony of assault with a firearm under section 245, subdivision (a)(2) and that the prior crime was both a serious felony under sections 667, subdivision (a)(1) and 1192.7, subdivision (c) and a violent felony under section 667.5, subdivision (c). The information also alleged another prior conviction in June 2003, for false imprisonment by violence under section 236, which was not ultimately established. Trial on the prior convictions was bifurcated.

Before closing arguments, the trial court, the prosecutor, and Howard's trial counsel discussed various procedural matters, including whether Howard intended to request a jury trial on the prior convictions. Howard was not present. The prosecutor noted that "[t]he prior convictions are bifurcated, so we need to know what Mr. Howard's position is before we discharge this jury." The court then asked Howard's attorney

41

whether he had spoken to his client about the issue. Counsel responded, "I have, and we have agreed that we will not be requesting a jury trial. He's going to admit to those if we were to get convictions [on the crimes charged]."

The next day, while the jury was deliberating, the trial court said to Howard's trial counsel, "I understand just for purposes of getting a couple of things off our list that[,] in the event that there is a verdict of guilty on any of the charges[,] you're prepared to admit the charges." Counsel indicated that an issue had arisen whether the information specified the correct crime as to the June 2003 conviction but that Howard was "willing to admit [the April 2001 assault conviction] if we want to do that right now. [¶] . . . [¶] So as to [his] prior conviction from April 18, 2001, out of the County of Alameda . . . [under section] 245[, subdivision] (a)(2), Mr. Howard is willing to admit he suffered that prior conviction." The court then stated, "Mr. Howard, it's been alleged . . . that you suffered a first prior conviction in Alameda County April 19th [sic], 2001, you were convicted of a violation of [section] 245[, subdivision] (a)(2)[,] assault with a firearm; and you're prepared to admit on the record that that is a true and correct conviction?" Howard responded, "Yes." This prior conviction was not mentioned on the record again, and Howard's sentence reflected a determination that he had suffered one prior strike.[18]

Before accepting a defendant's "admission that he has suffered prior felony convictions," a trial court must advise that the admission "waives, as to the finding that he has indeed suffered such convictions," his constitutional rights to jury trial, confrontation, and the privilege against self-incrimination. (*In re Yurko* (1974) 10 Cal.3d 857, 863 & fn. 5.) The failure to expressly advise a defendant of those rights and secure a waiver of them does not, however, automatically require reversal. (*People v. Mosby* (2004) 33 Cal.4th 353, 360-361.) Instead, "if the transcript does not reveal complete advisements and waivers, the reviewing court must examine the record of 'the entire

---

[18] Assault with a firearm under section 245, subdivision (a)(2) is a serious felony by definition (§ 1192.7, subd. (c)(31)), and thus there was no need for the trial court to review the record of conviction to determine whether the conviction constituted a strike. (Cf. *People v. Best* (1997) 56 Cal.App.4th 41, 43.)

proceeding' to assess whether the defendant's admission of the prior conviction was intelligent and voluntary in light of the totality of the circumstances." (*Id.* at p. 361.)

Initially, we note it is hardly clear that Howard even admitted to suffering the prior conviction. The question to which he responded "Yes" was whether he was "*prepared to admit*" that the conviction was "true and correct," not whether he actually admitted it. (Italics added.) Indeed, other conversations between the trial court and the attorneys suggested that Howard intended to admit to the prior convictions only if the jury found him guilty of the crimes charged. He does not contend that the court failed to secure a valid admission on this basis, however, so we will assume that his response to the court's question constituted an admission to the truth of the prior conviction.

The Attorney General concedes that error occurred, as "the record in this case does not contain any advisement or waiver of [Howard]'s rights before he admitted the prior conviction for assault with a firearm." She argues, however, that we can infer that the admission was knowing and voluntary under the totality of the circumstances. She points to the statement by Howard's trial counsel that he and Howard "ha[d] agreed that we will not be requesting a jury trial," apparently as evidence that Howard understood he had a right to have a jury decide the truth of the prior conviction.

Counsel's offhand remark about an off-the-record conversation does not establish that Howard understood his right to a jury trial as it related to the prior conviction, however, much less that he waived that right by merely saying "Yes" when the trial court asked whether he was prepared to admit the conviction's truth. Where, as here, a defendant has not been informed of the right to a jury trial and has not expressly waived that right, "we cannot infer that in admitting the prior the defendant has knowingly and intelligently waived that right as well as the associated rights to silence and confrontation of witnesses." (*People v. Mosby*, *supra*, 33 Cal.4th at p. 362.) Therefore, we must reverse the strike determination and remand for a retrial of the prior-conviction allegation. (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1421-1422.)

## III.
### DISPOSITION

Howard's convictions for two counts of attempted murder, criminal threats, and kidnapping are affirmed. His convictions for first degree murder and conspiracy to commit murder are reversed, as is the determination that he suffered a prior strike, and the cause is remanded to the trial court for further proceedings. The People shall have the option to retry the charges of first degree murder and conspiracy to commit murder and the prior-strike allegation. If the People do not retry Howard on the first degree murder element of premeditation and deliberation, the judgment shall be modified to reflect his conviction for second degree murder instead of first degree murder.

_____
Humes, P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.

44